Daniel *v.* DeGraffenreid.

W. M. DANIEL, Administrator, *et al. v.* W. F. DE-GRAFFENREID *et al.*

PARTNERSHIP. *Mortgage. Estoppel. Election.* M. F. DeG., Sr., died in 1869, leaving his will, in which, among other things, was recited, that he had loaned certain amounts to DeG. & Co., and then had notes for same, and might hold notes or obligations of said firm for other considerations, and had loaned certain children certain amounts, and that no interest be charged on the debts against DeG. & Co., or any of the children; that after his death the debts against DeG. & Co. be divided into five equal parts, and the firm have the right, within six months after his death, or longer, if physically impossible to do so sooner, to give notes for same payable in one, two, three, four and five years, without interest; and provided that after charging his children with advancements therein named and charged in his "Child's Book," and payment of debts, all his estate, together with moneys due and owing his estate by DeG. & Co., be equally divided between all his children. The executors named having declined to act, M. F. DeG., Jr., and D. qualified as administrators with the will annexed. The testator had been twice married and left three children, two sons, M. F. DeG., Jr., and T. D. DeG., and a daughter, Mary A., who had married P., issue of the first, and ten children, issue of the second marriage. On January 4, 1856, these two sons and the son-in-law, P., purchased an iron establishment in Kentucky and entered into partnership for the manufacture of pig iron, which, by agreemeent, was to continue five years. The testator held at the time of his death four notes upon the firm, and also mortgage executed January 19, 1859, by said firm upon thirteen hundred tons of pig iron, to secure a loan of that date of $25,000, all of which was specifically charged in the "Child's Book." On July 25, 1865, the testator executed a general power of attorney to M. F., Jr., and W. F. DeG. to take charge of, manage and settle his affairs and business. W. F. declined to accept, but M. F. DeG., Jr., accepted, and from 1866 to his father's death acted as such agent. On January 12, 1870, the administrators returned an inventory of the debts, etc., due their testator, including said notes on DeG. & Co.; copies of the notes had been made and pinned to the originals, and by mistake same were also included as notes. On March 3, 1870, the bill in this case was filed to have said will construed; to have an account and settlement of the agency of

M. F. DeG., Jr., as attorney in fact; to have the real estate parti-
tioned or sold for division, and to have said estate wound up and
distributed under said will. The bill expressly referred to said
"Child's Book" as being in the hands of the administrators, stating
same would be produced when called for. At the April term, 1871,
M. F. DeG. filed his affidavit denying the liability of himself and
T. D. DeG. upon said firm debts, and presented his petition asking
to be allowed to resign his trust as administrator, stating that the
master's report would be made at that term. This was allowed,
and he was made defendant. On September 30, 1871, said M. F. and
T. D. DeG. filed their special plea of *non est factum* to said firm
notes, averring that said firm had been dissolved before the execution
of same, and that they were executed by P. without authority. The
master's report was made April 21, 1871, charging the debts against
DeG. & Co. to be $55,516. M. F. and T. D. DeG. excepted to said
report, because said four notes were not the acts and deeds of DeG·
& Co.; because said $25,000 was not a proper charge against said
firm by reason of the pig-iron mortgaged to secure same having been
lost through and by the acts and conduct of the testator. A formal
and elaborate answer was filed by M. F. and T. D. DeG. after all
the proof had been taken. The proof showed that about April 1,
1859, the firm sold and disposed of its negroes, about ninety in
number, and mules, horses and wagons, and other personal prop-
erty, and that all manufacture by the firm suspended at that time,
and the said M. F. and T. D. DeG. returned to the testator's home;
that the testator was present at the sale of the negroes; that he
was paid $47,000 the firm owed him by transfer of notes by the·
purchasers for the negroes; that the land and about three thousand
tons of pig iron belonging to the firm were not sold. P. con-
tinued to conduct the financial affairs of the firm, and the sons
remained at their father's for two years, and then enlisted in the
Confederate army. At the time of the execution of the mortgage
the firm had on hand about 3,000 tons iron, and the iron mortgaged
was not separated from the bulk. The iron remained where it was
when the firm ceased manufacturing, until the early part of 1862,
when P., to prevent it falling into hands of the Federals, undertook
to have it removed to Clarksville, and he did move about 1,100 tons·
of same to that place, and a part of the remainder while being re-
moved was captured and confiscated, and that so captured and that
which had not been removed was entirely lost; that which was car-
ried to Clarksville was sold and disposed of by P. under the advice
of the testator, to prevent the "yankees" from getting it. After
the war the testator employed a claim agent to collect from the
U. S. government any claim he might have by reason of the confis-
cation of said iron.

Daniel *v.* DeGraffenreid.

*Held,* That said partnership had not been dissolved when said notes were made, and that the members of the firm were chargeable with same. 2. That the long time that was permitted to elapse by M. F. DeG., Jr., and T. D. DeG., without any enquiry into the transaction in regard to the mortgage on the pig iron to secure the $25,000 with knowledge that said $25,000 was held as a debt against them as members of said firm, repel the idea that it was satisfied, or that they considered it so. 3. That said M. F. DeG., Jr., and T. D. DeG. were estopped by their conduct from setting up defense of *non est factum* as to said notes. 4. That they having elected to file the bill and proceed as above set out, it was too late for them afterwards to get the defenses they afterwards claimed. 5. That said M. F. DeG. and T. D. DeG. were chargeable with said notes and said $25,000, with interest from the death of the testator.

FROM WILLIAMSON.

Appeal from the Chancery Court at Franklin. W. S. FLEMING, Ch.

H. H. LURTON and JESSE G. WALLACE for complainants.

VERTREES & VERTREES, QUARLES, THOMA & TURLEY, D. CAMPBELL & SON, ATHA THOMAS and W. S. McLEMORE for defendants.

COOKE, J., delivered the opinion of the court.

M. F. DeGraffenreid, Sr., died testate in Williamson county in September, 1869. He left a large estate and thirteen children. The executors named by the will renounced the trust, and in December, 1869, M. F. DeGraffenreid, Jr., and W. M. Daniel, a son and son-in-law of the testator, qualified as administrators with the will annexed. The testator had been twice married, and three of said children, viz., M. F. and

T. D. DeGraffenreid and Mary A. Pritchett, who had
intermarried with T. J. Pritchett, were the issue of the
first, and the remaining ten, of the second marriage.
On January 4, 1856, these two sons and the son-in-law,
Pritchett, purchased an iron establishment in Lyon county,
Kentucky, known as Mammoth furnace, and entered
into a partnership for the manufacture of pig-iron,
under the firm name and style of DeGraffenreid & Co.
At the time of the formation of this partnership, M.
F. DeGraffenreid, Jr., was about twenty-five or twenty-six
years of age, and T. D. DeGraffenreid about twenty-
two.    Neither of them had any business experience.
Pritchett was about forty years old, had extensive bus-
iness experience and fine business capacity, and it was
in view of this that the partnership was formed, the
father advancing to each of the sons $10,000 towards
paying for the property.    By the terms of this part-
nership it was to continue for five years—from the first
of January, 1856.    Thomas J. Pritchett was to have
the exclusive control and management of the financial
concerns of said furnace, and M. F. and T. D. De-
Graffenreid were to remain at the furnace and have a
general supervision of the business.    Neither party was
to make any charge for services.    Up to the time of
his death, the testator had advanced to Mrs. Pritchett
$12,500, and to M. F. and T. D. DeGraffenreid each
$14,000.    These advancements were recited in the will,
which then proceeded as follows:  "I have also loaned
certain amounts of money to the firm of DeGraffen-
reid & Co., composed, etc., (stating by name the mem-
bers), and I now hold the notes of said firm for the

payment of said moneys, and may hold the notes or obligations of said firm given on other considerations. I have also loaned Mathew F. and Tegnal Duncan, and my son-in-law, Thomas J. Pritchett, individually, certain sums of money from time to time, and have taken their notes respectively for the payment of the same; now, I do will and devise and direct, that no interest accruing on said notes, or on any claim which I may have against said firm or against my said sons and son-in-law, individually, at the time of my death, be charged by my estate, but that said interest accruing thereon before my death, be released, no matter what may be the form or terms of the securities or evidences of indebtedness I may hold againt them for such claim or claims; nor shall said interest accruing thereon as aforesaid, be charged against them, or either of them, as an advancement, it being my intention to give to them that advantage over my other children in the distribution of my estate.   And I do further will, devise and direct, that the principal of the debts or claims I may hold at my death on said firm, be consolidated and divided into five equal parts, and that said firm have the right to execute its notes for the payment to my estate of said parts, and to be payable one, two, three, four and five years after the date of my death, respectively and without interest; and the said firm shall have six months after my death within which to execute said notes, or longer should they be in such condition, owing to the troubled condition of the country, as to render it physically impossible for them to avail themselves of the permission hereby given.

And I further will and direct, that in the event that one or more of the members of said firm should die before the time for executing said notes shall have elapsed, the execution of said notes by the surviving partner or partners, shall be a sufficient compliance, provided the same shall be binding on the estate of the deceased partner or partners. Item: I do further will, devise and direct, that the notes or other evidences of debts charged in my 'Child's Book,' (in which I keep an accurate account of money or property advanced or loaned to my children), or which I may hold in any way against my two sons, M. F. DeGraffenreid and T. D. DeGraffenreid, or my son-in-law, Thomas J. Pritchett, or either of them *individually*, at the time of my death, be charged with no interest accruing thereon before my death." (Making the same provisions as to renewals or credit without interest as made in relation to said firm debts.) "Item: After charging my said children with the advancements herein named, and any others which I may hereafter make to them, or any of my children, which in that event, will be charged them as such in my 'Child's Book,' and after the payment of all just debts, etc., it is my will and desire, and I hereby direct and bequeath, that all my estate, both real, personal and mixed, of whatever nature or kind and wheresoever situate or locate, together with the moneys due and owing to my estate by the firm of DeGraffenreid & Co., hereinbefore mentioned, etc., be equally divided between all my children, share and share alike," etc.

This will was dated December 11, 1863. Thomas

Daniel *v.* DeGraffenreid.

J. Prichett died in 1864. The testator held, at the time of his death, four notes upon the firm of De-Graffenreid & Co. as follows: One dated July 9, 1859, for $1,800; one dated January 4, 1860, for $1,768; one dated April 16, 1860, for $4,000, and one dated November 14, 1860, for $13,100, aggregating $20,668. He also held a mortgage, executed January 19, 1859, by DeGraffenreid & Co., upon 1300 tons of pig iron, to secure a loan to them of that date of $25,000, all of which indebtedness of said firm to him was specifically charged and set forth in the "Child's Book," referred to in the above clauses of the will.

On July 25, 1865, said M. F. DeGraffenreid, Sr., executed a general power of attorney to M. F. and W. F. DeGraffenreid, to take charge of and manage his affairs and business, and to transact, arrange and settle the same. W. F. declined to accept, but M. F. De-Graffenreid did accept said agency and continued from in 1866 to conduct and manage and transact all his father's business up to his death.

On January 12, 1870, said administrators with the will annexed, returned an inventory upon oath of the debts, etc., due their testator, which included the notes of DeGraffenreid & Co. above specified. Copies of said four notes above specified had been made for some purpose, which were pinned to the originals, and these copies were also included in said inventory as part of said indebtedness, it not having been then discovered that they were copies.

On March 3, 1870, this bill was filed by M. F.

DeGraffenreid and Wm. M. Daniel, as administrators,. with the will annexed of M. F. DeGraffenreid, Sr., deceased, and M. F. DeGraffenreid and W. M. Daniel and wife in their individual rights, and T. D. DeGraffenreid and Mary A. Pritchett, against all the other children as heirs and devisees, etc., of said M. F. DeGraffenreid, Sr., deceased, and all of whom were minors.    The object of the bill was to have the administration of the estate transferred from the county to the chancery court, and the same wound up and distributed according to the provisions 'of said will under the directions of the chancellor; to have said will construed; to have an account of advancements to and indebtedness of any of said children to said estate, as well of the debts and effects belonging to said estate; also to have an account and settlement of the agency of said M. F. as attorney in fact; to have a large amount of real estate partitioned or sold for division among the heirs, and said estate finally wound up and distributed according to said will. Said "Child's Book" of the testator was expressly referred to as being in the hands of the administrators, and which was stated would be produced when called for. Guardians *ad litem* were appointed, and answers filed for said minors, respondents.

At the October term, 1870, an account was ordered, and at the same a decree was rendered construing said will, by which it was determined that inasmuch as Thomas J. Pritchett, one of the members of the firm of DeGraffenreid & Co., was dead, that his estate could not be bound by a renewal of said notes

of said partnership due said estate, as required by the terms of said will, and as said notes had not been renewed within six months after the testator's death, the parties were not entitled to avail themselves of the provisions of the will in regard to renewals and interest, etc., under the clauses of the will above set forth.

At the same term a decree was also entered reciting that said firm of DeGraffenreid & Co. was indebted to said estate, of all which mention and provision are made in the will, and the master was also specially ordered to take and state an account showing all the facts in relation to the above mentioned indebtedness of said firm of DeGraffenreid & Co. to said estate, the amounts and dates of the various loans and liabilities of whatever character, and any *credits* that may be claimed thereon.

At the April term, 1871, M. F. DeGraffenreid filed his affidavit, by which he denied the liability of himself and T. D. DeGraffenreid upon said indebtedness of said firm, and presented his petition asking to be allowed to resign his trust as administrator of said M. F. DeGraffenreid, deceased, in which it was stated the master's report would be made at the same term, which was allowed, and he permitted to be made a respondent. On September 30, 1871, said M. F. and T. D. DeGraffenreid filed their special plea of *non est factum* to said four notes of said company, by which they averred that said firm had been dissolved before the execution of the same, and that they were executed by T. J. Pritchett without authority, etc.

The master's report was made the 21st of April, 1871, by which he reported the indebtedness of said firm of DeGraffenreid & Co. to said estate to be the sum of $55,516, without interest. At the October term, 1871, an order was made in which it was recited that it being suggested by counsel that exceptions will be taken to so much of the first report as concerns the agency of M. F. DeGraffenreid, Jr., and the indebtedness of DeGraffenreid & Co., it is ordered that the parties have until the next term to file exceptions to so much of said report as concerns said agency and said indebtedness, and said report was in all other respects confirmed. On October 5, 1871, exceptions were filed to said report by M. F. DeGraffenreid, and on the 6th by T. D. DeGraffenreid: First, because said four notes above specified were not the acts and deeds of the firm of DeGraffenreid & Co., or of either of said defendants, * * and sixth, because the charge of $25,000 specified in the master's report is not a proper charge against said firm of DeGraffenreid & Co., by reason of the pig metal mortgaged to secure the same, having been lost through and by the acts and conduct of M. F. DeGraffenreid, Sr.; and because the master's report does not pursue the decree, or report the credits to which they are entitled, or report the facts as required by the decree. A formal answer was filed after all the proof had been taken, by which the liability of these parties is elaborately and formally denied for the reasons substantially stated in the exceptions to the master's report. There were other grounds of exceptions

and other questions raised—notably a promissory note executed to said DeGraffenreid & Co. by Henry & Co. for something over $11,000, which had been endorsed by DeGraffenreid & Co. to M. F. DeGraffenreid, Jr., and which was included in the master's report as a part of the $55,518 of indebtedness reported by him against said firm.    Pending this litigation, however, a receipt of M. F. DeGraffenreid, Sr., for said note was found, which showed it was received by him as collateral security before the other indebtedness of said firm to him.    About the sum of $12,000 was received by the estate of M. F. DeGraffenreid, Sr., in compromise of this debt, from a man named Mims, and it was insisted that the residue: was lost by the neglect of M. F. DeGraffenreid to collect it, and that his estate should be charged with it.    But this claim has been abandoned, and the only question of litigation now to be determined is as to the liability of said surviving partners of DeGraffenreid & Co. upon said notes, and also for said $25,000 loan secured by said mortgage.

The testimony as to these matters is quite voluminous and apparently conflicting.    The interests involved are very considerable, the case has been ably and elaborately argued on both sides, and we have given these questions as careful consideration as we have been able, and while we have reached a conclusion with which we are satisfied, they have not been free from doubts and difficulties.    As they are questions mainly of fact, and only of interest to the parties, we have not deemed it necessary to attempt

a very elaborate discussion of them. It is conceded that these notes were executed in the name of the partnership by the senior partner and sole financial manager of the business of the firm, within the time the partnership by the express terms of the written articles was to continue; but it is very earnestly insisted that it was dissolved by express agreement of all the partners, and notice of that fact given to M. F. DeGraffenreid, Sr., on or about April 1, 1859, and if not, then that the sole business for which the partnership was formed was wholly abandoned at that time, and hence said partnership became thereby dissolved, and of which said M. F. DeGraffenreid had notice, and hence Pritchett, who executed said notes, had then no authority to bind said firm. The negroes, about ninety in number, employed in the operation of said furnaces, as well as the mules, horses and wagons, and other personal property, were all sold and disposed of from about Christmas to April 1, 1859, except some poor mules and horses that were taken to Williamson county, and fatted and sold in the summer of that year. All operations of the furnace were at that time suspended, and said M. F. and T. D. DeGraffenreid left the furnace and returned to their father, in Williamson county, Pritchett never having remained there, but resided and kept the financial office of the company in Clarksville. M. F. DeGraffenreid, Sr., was present when the negroes sold to Woods, Lewis & Co. were delivered, about April 1, 1859, and there is no doubt but he knew the manufacture of iron was discontinued from that time.

And M. F. DeGraffenreid, Jr., testifies that all the partners of the firm and M. F. DeGraffenreid, Sr., and James L. James, the manager, and George Lewis, of the firm of Woods, Lewis & Co., were present when said negroes were delivered, and on that occasion all the members of the firm were present; and M. F. DeGraffenreid, Sr., was also present when the question of dissolution was discussed, and he, witness, proclaimed the partnership was dissolved. T. D. DeGraffenreid testifies that on the night of the same day the negroes were delivered he heard his father say to J. L. James that there was no firm of DeGraffenreid & Co.; it was dissolved; but both James and Lewis testify that they never heard either of the members of the firm say it was dissolved at any time. And James, whose deposition was taken by the respondents, is wholly silent as to this conversation, nor is he interrogated in relation to any such conversation. And according to this witness, James, the manager, was at the time speaking of the firm as existing, which elicited the above statement of M. F. DeGraffenreid, Sr., as a reply. A witness, who had been the attorney of the firm at Eddyville, Ky., testified that it was generally understood at that place after that time that the firm was dissolved. James testified to the same sort of *understanding;* but both of them state that what they mean by its being dissolved, was, that it had disposed of its negroes and stock, etc., and ceased to carry on the business.

At the time of the sale of the negroes the firm was indebted to M. F. DeGraffenreid, Sr., about $47,000

for moneys which he had loaned to them, and which was fully paid at that time by a transfer of that amount of the notes of the purchasers.   The partners retained the furnace and iron lands, about ten thousand acres, and the company also had on hand about three thousand tons of pig metal, about one-half at the furnace and the other half stacked up on the bank of the river, not far distant, in stacks of from five to six tons.   The company was indebted, as shown by the record, some thirty or forty thousand dollars more than it had assets to pay, outside of the amount of iron on hand.    The agent or employe, James, who had been the principal manager of the operations of the furnace, was left in charge of it. This large amount of iron had accumulated on account of the low prices, and which there is no doubt was the cause of the company ceasing to manufacture. There was no attempt at a settlement of the partnership; no effort, it seems, was made to dispose of the iron on hand or of the furnace itself (the title to which, as we have seen, however, was taken in the name of the individual partners).

Pritchett continued to conduct the financial affairs of the company as he had done before, and for a period of two years at least these respondents seem to have remained at home with their father, and nothing whatever is heard from them, or either of them, objecting to Pritchett's management of the affairs of the company, except they now say that when they heard he had borrowed $1,800 of their father, they remonstrated against it.    There is little doubt, we

think, from all the facts and circumstances of this case, that while it 'was the purpose of the company to cease the manufacture of iron, and wind up its business, the partnership was not formally dissolved, but continued for the purpose of winding up its affairs and disposing of this iron at such time as might be deemed most to its interest; that in view of the low prices of iron, it was thought best to hold it for better prices, and to enable the firm to do so, it is most likely the amounts for which these notes were executed was borrowed from time to time as the necessities of the affairs of the company required. This view is strongly supported by the fact that in a litigation in Kentucky, to which these respondents were parties, before this litigation occurred, by a sworn answer which they filed, it was then stated by them that the company ceased its operation in 1859, and the partnership expired by limitation in 1861. This, it is true, is attempted to be explained by the deposition of the attorney who drew the answer, and who states, according to his recollection, that the respondents stated to him at the time that the partnership was actually dissolved about April 1, 1859, and that by an interlineation in said answer he undertook to state that fact, but inserted it in the wrong place by mistake, but no attempt at such statement appears to have been made anywhere in said answer, as appears by the transcript of it in this record, and it is a significant circumstance that wherever these respondents, or either of them, made a record prior to this litigation, the same is in direct conflict with the theory

of this defense. The respondent, M. F. DeGraffenreid, Jr., as has been stated, was appointed attorney in fact to take charge of and control and manage his father's business, and which he assumed in 1865, or early in 1866, and at that time all his father's books and papers came into his possession, including these very notes and this " Child's Book " referred to in the will, in which they were specifically charged. They were seen by him then, as is admitted by himself, and proved by W. F. DeGraffenreid, the other attorney in fact appointed by said power, and he proves that when they were going over the papers, when they came to these notes, the respondent, M. F., suggested to this witness that he had better take charge of them, as he, M. F., was interested so far as they were concerned. He further proves that he always heard these notes spoken of by the respondents as subsisting debts against said firm, and never heard any thing else until the defenses were set up in this case. It is true in a subsequent examination he does say that he then remembers that in 1867 M. F. DeGraffenreid, Jr., told him that the partnership had been dissolved before these notes were executed and asked him what he, witness, thought he ought to do about it? But M. F. himself testifies that he had never examined said notes only to run over the figures in the left hand corner, and did not know the dates of them until long after that time. He qualified as executor, and assisted in making out and swore to the inventory, in which not only these notes, but the copies of them, were also returned as notes due the

Daniel *v.* DeGraffenreid.

estate, without making any record or reservation whatever upon the paper. It is true he testifies himself that he stated to the co-administrator, Daniel, before qualifying, that he was to be at liberty to contest these notes. This Daniel denies. It is proved by Mrs. Pritchett that at that time she heard him state to Daniel that he was going to contest the whole business, and that when the shoe pinched him he would be heard from, and that he objected to becoming administrator, because he was going to contest these notes. And the deputy clerk, who was present when the inventory was returned and sworn to, testifies that he did have the oath read to him before being qualified, and said that he had claimed an offset against these notes, but he, nowhere that we have discovered in this entire record, ever raised any question of Pritchett's right or authority to execute the notes until it was done by the defenses, or affidavit preparatory thereto, filed in this case, nearly a year after the bill was filed, and after a construction of the will adverse to his interest had been had, an account ordered, and the master's report about ready to be filed. Moreover, this bill was filed by both of these respondents with others as complainants, in which the will was exhibited, and the "Child's Book" referred to and offered to be produced in which these notes were specified, and a construction of the will asked for and had upon the very provisions in regard to the right to renew these notes, without interest, for a series of years, and no question as to their validity, or the authority of Pritchett to execute the same,

or their liability thereon, made or suggested; and although he saw these notes at the time he accepted the power of attorney from his father to transact his business for him, and then, as he states, believed there were $40,000 in amount of them, he does not pretend that he ever made any inquiry, or asked for any explanation of them during the lifetime of his father. There are various other facts and circumstances that might be noticed which tend to support the view we have taken, but those adverted to, we think, are sufficient to warrant the conclusion at which we have arrived, that the partnership was not dissolved when these notes were executed, and they are obligatory upon these respondents.

In this view it is unnecessary to consider the question of estoppel and election, which have been also elaborately discussed, but which we think are also conclusive upon the respondents. As to the $25,000 secured by the mortgage upon iron, no question is made as to the debt, but it is insisted that the same has been satisfied by the appropriation of the iron, or loss of it by the wrongful interference or neglect of the testator. At the time of the execution of the mortgage, as has been stated, the firm had on hand about 3,000 tons, and the iron mortgaged was not separated from the bulk, and it is not insisted, as we understand, that the title to the 1,300 tons vested in the mortgagee; said iron remained, as we have seen, at the furnace and on the bank of the river in the same situation it was when the company ceased manufacturing until in the early part of 1862, a period

of nearly three years, without any attempt on the part of any of the parties to dispose of it in any way, so far as the record shows. In the meantime the civil war had begun, and the Federal forces were approaching the locality of the furnace. Just before the fall of Fort Donelson, Pritchett undertook to have it removed to Clarksville to prevent its falling into the hands of the Federals, and did have about 1,100 tons removed to that place, and while engaged in the removal the steamboat loaded with a part of the remainder was captured by the Federal forces, and the boat and cargo confiscated or carried off. This boat load, as well as that which had not been removed, was entirely lost. Of the 1,100 tons that was carried to Clarksville, which was unloaded at or near the warehouse of Pritchett, one boat load was shortly afterwards sent to Nashville, presumably by Pritchett, no further account of which is anywhere given. Of the remainder, about 875 tons were sold by Pritchett in the latter part of 1862.

It is insisted by these respondents that when this iron was brought to Clarksville, M. F. DeGraffenreid, Sr., by virtue of or under his mortgage, took charge of it, and whatever was done with it afterwards was done for him and by his direction and authority, and he and his estate are responsible for it. It is proved that in 1862 M. F. DeGraffenreid, Jr., who had entered the Confederate army at the beginning of the war, was at home at his father's, and that he, Pritchett and his father had a conference or conferences about this iron which was then at Clarksville, and that

M. F. DeGraffenreid, Sr., and Pritchett were both strongly in favor of selling the iron, and Mr. M. F. DeGraffenreid, Jr., was strongly opposed to it, and that he told his father that if he was determined to have it sold, he washed his hands of it. The objection he urged to its being sold was that the price would enhance; and the reasons why the elder De-Graffenreid and Pritchett wanted it sold was that it was in danger of falling into the hands of the "Yankees," and of being entirely lost; and there is some proof indicating that Pritchett went to Clarksville, which was then, as it seems, between the lines of the armies, to see about selling the iron, or procuring some one to do so for him, and that at the instance, or at least by the concurrence, of M. F. DeGraffenreid, Sr., and against the will of M. F., Jr., the iron was subsequently sold by Pritchett, or by his authority for about $20,000—200 tons of it to one Davie, and 685 tons to one Dortch, and the proceeds paid to Pritchett or his agent, of which he paid $1,000 upon the indebtedness of the firm to one Given, Watts & Co., and applied $1,700 to the payment to them of an individual debt of his own; what he did with the residue does not definitely appear; none of it was paid to M. F. DeGraffenreid, Sr.; nor does it appear that he ever made any inquiry as to what was done with the proceeds. On the other hand it is shown by the proof that Pritchett's estate was insolvent, and was wound up in the chancery court, and that in speaking of the proceeds of this iron, M. F. DeGraffenreid, Jr., spoke of filing a claim

against his estate for these proceeds, and said he would give whatever he received to his widow, Mrs. Pritchett. It is true, after this testimony was taken, he undertakes to explain it by stating that as he was then acting as attorney in fact for his father, it was in that capacity he spoke of filing the claim. But the witnesses did not so understand him, and it is unfortunate for this explanation that while as attorney in fact of his father he might have filed such a claim, yet in that capacity he would have had no right to have given the proceeds to his sister.

The iron that was left at the furnace was all taken, and perhaps confiscated, and there is little doubt but this would have been had it not been sold. It was seized at one time by the Federal authorities or forces, and its release procured by one Blackman, a Union man, who claimed to be the owner of it, which he says he did for the interest of Pritchett, who he understood to be the owner. The iron was understood while at Clarksville to belong to the company by those most intimately associated with him as well as by the purchaser of it.

We are satisfied that M. F. DeGraffenreid, Sr., did feel that he had an interest in the iron by virtue of his mortgage, but we are also satisfied that the conference at which he urged the sale was a mere family conference, in which he was advising and urging what he considered best for all of them, and that there was no change in either the title or possession of the iron thereby. That he was most indulgent and liberal to this firm and the individual members

of it, there can be no doubt; and that the iron remained in the possession of Pritchett, and was sold by him on account of the firm, and was in fact the property of the firm, we are perfectly satisfied.

It is shown that in April, 1866, M. F. DeGraffenreid, Sr., employed a claim agent to try to collect the proceeds of the confiscated iron from the United States government, and the claim agent states that he thinks he told him that the iron belonged to him. His contract with this claim agent, however, which is exhibited in the record, shows that he had employed said agent "to attend to and collect any claim he may have against the United States government by reason of the taking and confiscating the iron that was left at Mammoth furnace, and was to give him ten per cent. of whatever he might collect, and some traveling expense money. Pritchett was dead, and both of the other members of the firm had been in the Confederate army, and not in a very good condition to prefer claims against the United States government, and we have no doubt, from the circumstances, that as he had the mortgage, and consequently some claim to the iron, whether vested or not, it was thought best that it should be made in his name, and which was a mere experiment. It never was heard of afterwards. Pritchett, before his death, desired Given, Watts & Co., who were creditors of the firm, to interpose as such, and have the proceeds of the confiscated iron appropriated by the United States to the payment of their debt against the firm, and M. F. DeGraffenreid, Jr., as is shown by a letter of

his contained in the record, in a litigation with Given, Watts & Co., in which he and T. D. were sued as surviving partners upon a firm debt, sought to obtain a credit for the $1,700 of the proceeds of this Clarksville iron, upon the ground that they, Given, Watts & Co., had received it from Pritchett upon his own debt with knowledge that 'it was the proceeds of iron belonging to the firm which had been sold by him. It is shown that Pritchett, on his final settlement with Dortch for the iron sold him, signed the receipt, "T. J. Pritchett for DeGraffenreid, Sr." Why he did so is not shown, nor did Dortch, to whom the receipt was executed, know, nor had he known M. F. De-Graffenreid, Sr., in the transaction. It is not shown that he had any knowledge of the same, nor could he be affected by it, unless it may be looked to as a circumstance for what it is worth, as tending to show that he, Pritchett, may have been acting in the sale of the iron for DeGraffenreid, Sr., but which is rebutted by the weight of the facts and circumstances in the case, as well as in regard to the particular transaction. The long time that was permitted to elapse without any enquiry into this transaction, with knowledge that this was held as a debt against these respondents as members of said firm, repels the idea, we think, that it was satisfied in any manner, or that they considered it so. The chancellor decreed, sustaining said plea of *non est factum*, and held that said notes were not obligatory on these respondents, and that said $25,000 had been satisfied, or that said testator's estate was responsible for the iron, and that

M. E. Cator, Executor of Bazil Berry, deceased.

it was also accountable for the amount received upon the Henry & Miners note held as collateral security. The Referees came to a different conclusion, and have reported that said notes and said $25,000 indebtedness, evidenced by said mortgage, are valid and subsisting debts against said respondents, subject to ·be credited with the amount received upon the Miners compromised claim.

We concur with the Referees. Their report will be confirmed, and the decree of the chancellor reversed, and the account taken as here indicated. No interest will be calculated upon said debt until after the testator's death. The cause may be remanded to the chancery court for final settlement of the estate. The costs of this court will be paid by the respondents, M. F. and T. D. DeGraffenreid.

WILSON, Sp. J., dissented from the above opinion on two points.